1  WOLF HALDENSTEIN ADLER
     FREEMAN & HERZ LLC
2  ADAM J. LEVITT (*pro hac vice*)
   levitt@whafh.com
3  55 West Monroe Street, Suite 1111
   Chicago, Illinois  60603
4  Telephone:  312/984-0000
   Facsimile:  312/984-0001
5
   SEEGER WEISS LLP
6  JONATHAN SHUB (237708)
   jshub@seegerweiss.com
7  10960 Wilshire Boulevard
   Los Angeles, California  90024
8  Telephone: 310/477-2244
   Facsimile: 310/477-4123
9
10 EDELSON MCGUIRE, LLC
   MICHAEL ASCHENBRENER (SBN 277114)
11 350 North LaSalle Street, 13th Floor
   Chicago, Illinois  60654
12 Telephone: 312/589-6370
   Facsimile: 312/589-6378
13 maschenbrener@edelson.com

14 Plaintiffs' Interim Co-Lead Counsel
15 [Additional Counsel Appear on Signature Page]

16
                  **UNITED STATES DISTRICT COURT**
17
                 **NORTHERN DISTRICT OF CALIFORNIA**
18

19
   IN RE ZYNGA PRIVACY LITIGATION          )  Case No. CV 10-04680
20                                          )
                                            )
21                                          )  **CLASS ACTION**
                                            )
22                                          )  **SECOND AMENDED CONSOLIDATED**
                                            )  **CLASS ACTION COMPLAINT**
23                                          )
                                            )  **ACTION FILED:  10/18/10**
24                                          )
                                            )  **JURY TRIAL DEMANDED**
25  _____ )
26
27
28

   SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT – CASE NO.  CV 10-04680

Richard Beiles, Nancy Graf, Howard L. Schreiber, John Swanson, and Lellaniah Adams (collectively "Plaintiffs"), on behalf of themselves and all others similarly situated (the "Class" and "Subclass," as defined below), by their undersigned counsel, bring this action against defendant Zynga Game Network, Inc. ("Zynga," the "Company," or "Defendant"), and make the following allegations on information and belief, except as to allegations pertaining to Plaintiffs, which are based on their respective personal knowledge:

## NATURE OF THE ACTION

1.     Plaintiffs allege Zynga divulged Class members' personally identifiable information – specifically, their Facebook User IDs – to third party advertisers, Internet marketing companies, data brokers, and web tracking companies in violation of its contractual promise not to do so, in violation of applicable federal and state laws, and without Class members' knowledge, authorization, or consent.

2.     Unbeknownst to Plaintiffs and the other Class members, Zynga perpetrated its scheme through its gaming application programs ("gaming apps" or "apps"), such as FarmVille, FrontierVille, and CityVille.  Zynga enables Facebook members to play these games while on Facebook's social networking website, www.facebook.com, and intentionally designed these games in such a way as to enable them to automatically collect and then divulge – *i.e.*, sell – Class members' personally identifiable information to third parties.

3.     Zynga unlawfully divulges the personally identifiable information of every Facebook user who uses Zynga's gaming apps through Facebook.  This includes persons who have affirmatively set their Facebook profiles to the strictest privacy settings available.

4.     The information Zynga divulges about Plaintiffs can readily, if illegally, be linked and shared with data brokers and advertisers to create comprehensive personal profiles.  These profiles are made without consumers' knowledge, authorization, or consent and violate Zynga's privacy disclosures and assurances.

5.     Not only does Zynga misuse its gaming apps users' personally identifiable information, it also collects and divulges personally identifiable information about its gaming apps users' friends (taken from those Zynga gaming apps users' Facebook pages) to third parties.

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT – CASE NO.  CV 10-04680

6.      Plaintiffs and the other Class members have sustained injuries in fact arising from Zynga's conduct as alleged herein, as Plaintiffs bargained for a far different product or service – that is, a Zynga gaming experience that protected their personally identifiable information as promised – than they in fact received.  Plaintiffs accepted Zynga's promise to abide by its privacy policy.

7.      Furthermore, the proposed subclass (the "Subclass," as defined below) – comprised of individuals who purchased "virtual currency" from Zynga with U.S. currency – were further injured by having expended money for credits usable only within a Zynga game that they would not have purchased but-for Zynga's promise to abide by its privacy policy.

8.      Plaintiffs bring this lawsuit against Zynga on behalf of themselves and a nationwide Class of all users of Zynga's Facebook gaming applications, as well as a proposed Subclass of all users of Zynga's Facebook gaming applications who purchased virtual currency from Zynga, alleging violations of the Electronic Communications Privacy Act, 18 U.S.C. § 2510, *et seq.* (the "Wiretap Act"), 18 U.S.C. § 2701, *et seq.* (the "Stored Communications Act"), and the Computer Fraud and Abuse Act, 18 U.S.C. § 1030, *et seq.*, breach of contract, breach of the covenant of good faith and fair dealing, violation of the Cal. Bus. & Prof. Code § 17200 and the Consumers Legal Remedies Act, Cal. Civ. Code § 1750, *et seq.*, and for injunctive and declaratory relief.

9.      Prior to the commencement of these actions, Zynga's Privacy Policy misleadingly assured consumers that Zynga does "not sell or rent your 'Personally Identifiable Information' to any third party" and "does not provide any Personally Identifiable Information to third-party advertising companies[.]"  But on November 30, 2010 – mere weeks after this litigation was commenced – Zynga "updated" its Privacy Policy, omitting the just-quoted promises regarding Zynga's protection of its gaming apps users' personally identifiable information and replacing them with a much broader accounting of the ways in which Zynga collects and "shares" personally identifiable information with third parties.  Zynga's abrupt Privacy Policy about-face, coupled with the fact that this "update" accompanied no actual change in operations, is a naked attempt by Zynga to insulate itself from future liability and an admission of its wrongful conduct.

**PARTIES**

**A.   Plaintiffs**

10.     Richard Beiles is a resident of Chicago, Illinois.  During the time period relevant to this action, Mr. Beiles was a registered user of Facebook and used one or more of Zynga's Facebook gaming applications.

11.     Nancy Walther Graf is a resident of Ramsey County, Minnesota.  During the time period relevant to this action, Ms. Graf was a registered user of Facebook and used one or more of Zynga's Facebook gaming applications.

12.     Howard Schreiber is a resident of Long Beach, New York.  During the time period relevant to this action, Mr. Schreiber was a registered user of Facebook and used one or more of Zynga's Facebook gaming applications.

13.     John Swanson is a resident of San Jose, California.  During the time period relevant to this action, Mr. Swanson was a registered user of Facebook and used one or more of Zynga's Facebook gaming applications.

14.     Lellaniah Adams is a resident of Marion County, Oregon.  During the time period relevant to this action, Ms. Adams was a registered user of Facebook and used one or more of Zynga's Facebook gaming applications.  During the relevant time period, Plaintiff Adams also purchased at least $20 worth of game cards from Zynga to purchase in-game items in Zynga's apps.

**B.   Defendant**

15.     Zynga Game Network, Inc. is a Delaware corporation founded in January 2007. Zynga maintains its headquarters in San Francisco, California. Zynga has expanded rapidly, both through internal growth and acquisition of other social network game companies.  Currently, Zynga has over 1,100 employees working in domestic offices in California, Maryland, Massachusetts, and Texas and in international offices in India, Japan and China.  Zynga claims to have over 360 million "monthly active users" and over 65 million "daily active users" of its products.

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT – Case No. CV-10-04680-JW

**JURISDICTION AND VENUE**

16.     This Court has subject matter jurisdiction pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. §§ 1332(a) and 1332(d) because the amount in controversy exceeds $5,000,000, exclusive of interest and costs, and more than two-thirds of the members of the proposed Class are citizens of states different than that of Zynga.  This Court also has subject matter jurisdiction pursuant to 28 U.S.C. § 1331, which confers upon the Court original jurisdiction over all civil actions arising under the laws of the United States, and pursuant to 18 U.S.C. §§ 2520 and 2707 and 18 U.S.C. § 1030.  This Court also has supplemental jurisdiction over Plaintiffs' state statutory claims and common-law claims pursuant to 28 U.S.C. § 1367.

17.     This Court has personal jurisdiction over Zynga because a substantial portion of the wrongdoing alleged in this Complaint took place in the State of California and because Zynga has its principal place of business in, is authorized to do business in, has sufficient minimum contacts with, and/or otherwise intentionally avails itself of the markets in the State of California.

18.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because, as a corporation subject to personal jurisdiction in this District, Zynga resides in this District and a substantial portion of the events and conduct giving rise to the violations complained of herein occurred in this District.

**FACTUAL ALLEGATIONS**

**A.     About Zynga And Its Facebook Gaming Apps**

19.     Zynga is the largest developer of gaming applications used on the social networking site Facebook.com, and holds itself out as "the #1 provider of gaming experiences on social networks, connecting you to your friends through word games, casino games, role playing games, and more!"  *See* "About Zynga," at http://www.facebook.com/FarmVille#!/FarmVille?v= info (last visited July 14, 2011).

20.     Zynga's Facebook gaming apps are developed specifically to run on and in the context of a Facebook users' personal Facebook profile page.

21.     Zynga's most popular gaming apps – including FarmVille, Texas Hold'Em, FrontierVille, Café World, Mafia Wars, Treasure Isle, YouVille, CityVille, Vampires, Street

Racing, Scramble and Word Twist – are offered by Zynga on the Facebook website to Facebook users, including Plaintiffs and the other members of the Class. Zynga's "CityVille" and "FarmVille" gaming apps alone have or had more than 90 million and 58 million "monthly active users," respectively.

22. A Facebook user must be logged in to Facebook in order to use the gaming apps that Zynga has created for the Facebook website.

23. Zynga does not charge Facebook users a fee to use Zynga's Facebook gaming apps.

24. Rather, Zynga, among other things, contracts with third-party advertising companies to place ads in its gaming apps, garnering substantial profits therefrom.

25. Zynga also sells "virtual currency" that game players can purchase from Zynga using their credit cards (or acquire in other ways not relevant to this Complaint) to use in Zynga games.

26. Zynga programs its gaming apps in a way that enables Zynga to collect its gaming apps users' personally identifiable information and then divulge that information to third parties, including advertisers, internet marketing companies, data brokers, and web tracking companies

27. As more fully described below, Zynga derives substantial profits by divulging its gaming apps users' personally identifiable information to third parties, who use the personally identifiable information they obtain from Zynga to target ads to Zynga gaming apps users and to assemble individualized consumer profiles, which they, in turn, can sell to other third parties for profit.

28. Zynga's customers thus pay for use of Zynga's gaming apps with their personal information. In other words, Zynga's users exchange something valuable – access to their personal information – for Zynga's gaming apps and Zynga's promise to safeguard their personal information. Zynga's promises not to disclose its customers' PII to third parties without those customers' authorization or consent.

29. Zynga collects revenues in large part because the PII it takes from its customers increases the value of Zynga's advertising services. Because Zynga has access to highly personal information about its customers, Zynga's advertising platform is particularly attractive to

advertisers and marketers who can and do use that personal information to deliver highly targeted ads to Zynga's customers.   In this regard, Zynga's services are vehicles to acquire personal information about its consumers in order to sell that personal information to advertisers.

30.   If not for the inherent and identifiable value of access to its customers' personally identifiable information, Zynga would be much less profitable.   Thus, Zynga's promises and concerning its safeguarding of the personally identifiable information it receives from its customers in exchange for its services are vital to its business and its users.

31.   This business model allows users to contract with Zynga: users provide valuable PII; Zynga provides valuable services backed by privacy promises. This business model also allows Zynga to make money because of the inherent monetary value of PII.

32.   Thus, from a revenue perspective, Zynga is an advertising company; developing and producing gaming apps is just the hook it uses to lure users to its advertising platform, just like television networks develop and produce sitcoms and dramas to lure viewers to their advertising platforms. Zynga makes money much like television networks, magazines, newspapers, and other successful media: by selling advertising.

33.   What separates Zynga from traditional media is its unprecedented access to information about the individuals who will view the ads that it sells to advertisers because of Zynga's interdependence with Facebook.

34.   Historically, advertisers relied upon demographic sampling and other means to make educated guesses at the characteristics and preferences of consumers. In contrast, Zynga – via Facebook – actually knows the true identities and personal preferences of its customers.

35.   Zynga is thus an incredibly compelling advertising platform.   Advertisers need not guess as to whether any given advertisement will reach the appropriate demographics; Zynga can and does assure each advertiser that their advertisements will reach precisely the right audience. Therefore, Zynga's access to user PII makes advertising on Zynga more effective, efficient, and valuable for advertisers, and in turn, more valuable for Zynga.

36.   If not for the inherent and identifiable value of its users' PII, Zynga would generate substantially less revenue. Thus, its promises concerning the safeguarding of the personal

consumer data Zynga receives in exchange for its products and services are vital to its business and to its advertising partners, whether used by those advertisers in conjunction with advertising on Zynga or using that PII elsewhere and for other purposes.

37.   Zynga also profits from its customers by selling them "virtual currency," which Zynga users use to purchase "virtual items" in Zynga games.  For example, Zynga users can use "virtual currency" to buy virtual tractors within the FarmVille app.

38.   This business model – providing online products and services to consumers and profiting from selling access to their PII to third parties – has burgeoned into a multi-billion dollar per year industry.[1]  Indeed, Zynga's practices – providing gaming apps to consumers and profiting from the sale of those consumers' personal information to advertisers – have helped Zynga achieve a market valuation exceeding $15 billion.

39.   Indeed, consumers themselves are starting to recognize the value of their own PII, and online giant Google has contemplated paying consumers for their personal data.

40.   As reported by the *Wall Street Journal*, a confidential internal Google document outlined ways Google could profit from its vast databases of personal information, including allowing users to "opt-in to share their personal data in return for direct benefits (e.g., [Google] will pay for all/part of [the user's] ISP bill or other affiliate/coupon benefits)."[2]  In the document, Google also contemplates that "Google can build a data exchange/trading platform allowing individual data owners to transact with others directly, or openly sell their data to any bidders."[3]  In fact, as reported by the *Wall Street Journal*, consumers can now sell their own data for

---

[1]     Steve Lohr, *Unboxed—Rewarding Consumers for Providing Personal Data*, N.Y. Times, Jul. 17, 2010, http://www.nytimes.com/2010/07/18/business/18unboxed.html?_r=1.

[2]     *Google: Into the Future*, http://online.wsj.com/public/resources/documents/info-flash10.html?project=GOOGLEDOCS1008 (last visited July 14, 2011).

[3]     Jessica E. Vascellaro, *Google Agonizes on Privacy as Ad World Vaults Ahead*, Wall St. J., Aug. 10, 2010, http://online.wsj.com/article/SB10001424052748703309704575413553851854026.html

considerable, and measurable, sums of money, thus realizing the sort of gains that Zynga is accustomed to generating from the sale of personal data.[4]

**B. Zynga's Illegal Transmission And Sale Of Personally Identifiable Information**

41. Zynga's Facebook gaming apps work by loading themselves into an "inline frame," or "iframe," on the user's Facebook page. An iframe is essentially one webpage (here, a page running a Zynga gaming application, such as FarmVille) embedded within another webpage (here, the user's Facebook page).

42. For example, when a user interacts with Facebook to load Zynga's FarmVille Facebook gaming app, that user's browser location bar will show http://apps.facebook.com/onthefarm. The iframe content in which that gaming app appears, however, is actually controlled by the application developer – in this case, Zynga. This iframe architecture enables Zynga to surreptitiously collect and then divulge personally identifiable information about each of its FarmVille gaming app users without those users ever leaving Facebook webpage or the FarmVille gaming app within that webpage.

43. In order to play a Zynga gaming app, a user clicks on a link within Facebook. This action causes the transmission of electronic data between the user and at least Facebook such that a Uniform Resource Locator ("URL")[5] is generated.

44. For all of Zynga's Facebook gaming apps, the content loaded into the iframe in the user's Facebook page includes the gaming app itself, as well as third party advertisements.

45. In order to determine which advertisements will be displayed to each of its gaming apps users, Zynga's various gaming apps surreptitiously and automatically forward "referrer" information about its gaming apps users to third party data brokers, advertisers, and others, all

---

[4] Julian Angwin and Emily Steel, *Web's Hot New Commodity: Privacy*, Wall St. J., Feb. 28, 2011, http://online.wsj.com/article/SB10001424052748703529004576160764037920274.html

[5] URL stands for "Uniform Resource Locator." A URL is a string of characters used to identify a "resource" on the Internet. A "resource" is a generic and abstract definition of every thing or entity that can be identified, named, addressed or handled, in any way whatsoever, by the Internet at large or in any networked information system. The resource at issue here is the address of a specific Facebook user's Facebook profile page.

without those gaming apps users' knowledge, authorization, or consent.

46.    "Referrer" information, in the case of an application running as an embedded iframe in a gaming apps user's Facebook page, includes the URL of the page loading the ad – which in this case, upon information and belief, is the URL generated by the transmission of electronic data between Facebook and the user.

47.    Through Zynga's Facebook gaming applications, the referrer information Zynga collects includes, as part of the URL, the Facebook gaming apps user's unique Facebook ID.

48.    As more fully explained below, a Facebook ID is a unique number assigned by Facebook to every Facebook user.

49.    Zynga's transmission of its gaming apps users' personally identifiable information to third parties, including advertisers, internet marketing companies, data brokers, and web tracking companies, is the product of Zynga's business plan to collect and transmit that data for steep profits.

50.    Indeed, Zynga could easily stop transferring its gaming apps users' Facebook IDs by, for example, replacing the sensitive information in the URL transferred to the third party advertisers with the result of applying a cryptographic hash function to that data or by employing encryption.   That change alone would prevent Zynga's transmission of its gaming apps users' personally identifiable information to third parties, including advertisers, internet marketing companies, data brokers, and web tracking companies.

51.    Zynga also sells its gaming app users' personally identifiable information to third-party data gathering companies, also known as data brokers, such as Rapleaf, Inc., for substantial profit.  By linking Facebook user IDs and other personally identifiable information obtained from Zynga to their existing database of internet users, data brokers are able to assemble highly-detailed profiles of individual consumers, which they can then sell to other third parties for profit.  Zynga's transmission and disclosure of its gaming apps users' personally identifiable information to data brokers like Rapleaf has serious and far-reaching repercussions.  According to an article published on October 21, 2010 on www.CNN.com, for example, a privacy researcher found that by using only a name, an email address, and information provided by data brokers, he could link a subject's

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT – Case No. CV-10-04680-JW

name to his or her entire social security number. *See* Goldman, David, *Rapleaf: The Company that sells your identity*, CNNMoney, Oct. 21, 2010, http://money.cnn.com/2010/10/21/technology/rapleaf/index.htm.

52.    Zynga's disclosure and transmission of its gaming apps users' personally identifiable information to third party data brokers enables those data brokers to definitively correlate a real name with a pseudononymous IP address, cookie, or profile, which, in turn, allows them to track a user's web-surfing activity.

53.    Zynga's disregard for its gaming apps users' privacy is unsurprising.  In spring 2009, during a lecture given in Berkeley, California, Zynga CEO Mark Pincus admitted that defrauding Zynga's gaming application users was an integral part of the Company's business model.  The lecture was captured on videotape and posted to the Internet by TechCrunch.  The following is an excerpt from Pincus' comments:

> I knew that I wanted to control my destiny, so I knew I needed revenues, right, [expletive], now.  Like I needed revenues now.  So I funded the company myself but I did every horrible thing in the book to, just to get revenues right away.  I mean we gave our users poker chips if they downloaded this zwinky toolbar which was like, I don't know, I downloaded it once and couldn't get rid of it. *laughs* We did anything possible just to just get revenues so that we could grow and be a real business…

*See* Michael Arrington, *Zynga CEO Mark Pincus: "I Did Every Horrible Thing In The Book Just To Get Revenues"*, Techcrunch.com, Nov. 6, 2009, http://techcrunch.com/2009/11/06/zynga-scamville-mark-pinkus-faceboo/.

### C.    About Facebook

54.    Facebook is the world's largest social networking website, with over 750 million registered users worldwide.  According to Facebook, its "mission is to give people the power to share and make the world more open and connected."  To accomplish that mission, Facebook allows anyone with access to a computer and an internet connection to register for its services free of charge.

55.    One of the few requirements Facebook places on its registrants is that they provide their actual names, rather than merely create a "screen name" or "user name," as is commonplace with other website registrations.  Facebook also requires registrants to provide their gender and

date of birth.  *See* Facebook's Privacy Policy, December 22, 2010 revision, available at http://www.facebook.com/policy.php (last visited July 14, 2011) ("When you sign up for Facebook you provide us with your name, email, gender, and birth date … In addition to name and email address, we require you to provide your gender and birth date during the registration process … Because your date of birth and gender are required, you cannot delete them").

56.    Once registered, Facebook users may post a multitude of information to their own personal "Facebook profile" page, including their birth date, place of birth, current and past addresses, present and past employment, relationship status, personal pictures, videos, and more. Facebook presents users with template forms on which to enter this type of personal information.

57.    Facebook is accomplishing its stated mission. Facebook users share an unprecedented amount of personal information through the service. While users share this information in order to connect and communicate with other Facebook users, they also share their information with Facebook itself.

58.    All this personal information is valuable to Facebook – and gaming app developers, such as Zynga, who are able to sell the information to advertisers looking to most effectively target their ads.

### D.    Facebook User IDs Are Protected, Personally Identifiable Information

59.    A Facebook User ID is a unique number assigned by Facebook to every Facebook user.  Before June 2009, when creating an account, Facebook automatically assigned the user an identification number.  In June 2009, according to the "The Facebook Blog," the randomly assigned number, "like 'id=592952074," would soon change to allow users to put in their real names in the URL.  According to Facebook,

> Your new Facebook URL is like your personal destination, or home, on the Web. People can enter a Facebook username as a search term on Facebook or a popular search engine like Google, for example, which will make it much easier for people to find friends with common names. Your username will have the same privacy setting as your profile name in Search, and you can always edit your search privacy settings here.

Blaise DiPersia, *Coming Soon: Facebook Usernames*, The Facebook Blog, Jun. 8, 2009, http://blog.facebook.com/blog.php?post=90316352130.

60.     Facebook specifically prohibits application developers – including Zynga – from transferring any data received from Facebook to their advertisers, or selling Facebook user data to any party, which includes User IDs.  To that end, and in pertinent part, Facebook's Statement of Rights and Responsibilities, Oct. 4, 2010 revision, available at http://www.facebook.com/terms.php, (last visited Jan. 10, 2011), states:

> If you are a developer or operator of a Platform Application or website ... You will not directly or indirectly transfer any data you receive from us to (or use such data in connection with) any ad network, ad exchange, data broker, or other advertising related toolset, even if a user consents to that transfer or use ... You will not sell user data.

61.     Correspondingly, on Facebook's Developers' Blog, http://developers.facebook.com/blog/post/418 (Oct. 17, 2010) (last visited July 14, 2011), Mike Vernal, a member of the Facebook platform engineering team, in a posting entitled "Using Facebook UIDs," regarding Facebook, asserts:

> We take user privacy seriously … Our policy is very clear about protecting user data, ensuring that no one can access private user information without explicit user consent. Further, developers cannot disclose user information to ad networks and data brokers. We take strong measures to enforce this policy, including suspending and disabling applications that violate it. Recently, it has come to our attention that several applications built on Facebook Platform were passing the User ID (UID), an identifier that we use within our APIs, in a manner that violated this policy.

62.     Facebook thus conditions its application developers' receipt of PII on those developers' commitment not to transmit that PII to third parties.  By interposing that condition – to which Zynga agreed – Facebook's application developers were only intended recipients of Facebook-originated PII to the extent that those application developers did not transmit that PII to third parties.

63.     Because Zynga sold its users' PII to third parties – in violation of Facebook's conditional authorization and in violation of both Facebook's and Zynga's own policies – Zynga was neither an intended recipient of its users' PII, nor did its customers consent to Zynga's use and sale of their PII in the manner alleged herein.

**E.     Zynga's "Old" Privacy Policy**

64.     Despite having designed its Facebook gaming apps to capture and transmit its gaming apps users' personally identifiable information to third parties, Zynga affirmatively

represented in its privacy policy – as it existed until November 30, 2010 – that Zynga does "not sell or rent your 'Personally Identifiable Information' to any third party" and "does not provide any Personally Identifiable Information to third-party advertising companies."   A copy of that privacy policy (hereinafter "Old Privacy Policy") is annexed hereto as Exhibit A.   Those representations were demonstrably false.

65.   Because of the way Zynga designed its gaming apps, Zynga captured, retained, and divulged its gaming apps users' personally identifiable information – including their Facebook User IDs – to third parties each time those gaming apps users, including Plaintiffs and the other Class members, used Zynga's Facebook gaming apps within Facebook.   Zynga's practices in this respect directly contravened its Old Privacy Policy.

## F.   Exposure Of Zynga's Privacy Violations

66.   On or about October 18, 2010, Zynga's illegal practices, as alleged herein, were revealed by a *Wall Street Journal* investigation. *See* Emily Steel and Geoffrey A. Fowler, *Facebook in Privacy Breach*, WALL ST. J., Oct. 18, 2010, available at http://online.wsj.com/article /SB10001424052702304772804575558484075236968.html.

67.   The investigation found that the gaming apps the *Wall Street Journal* analyzed – including Zynga's five most popular Facebook gaming apps – "were sending Facebook ID numbers to at least 25 advertising and data firms, several of which build profiles of internet users by tracking their online activities." *Id.*

## G.   The Federal Trade Commission's Position On Consumer Privacy And Data Protection

68.   The Federal Trade Commission ("FTC") has recently expressed its concerns about protecting consumer privacy.   In its December 2010 Staff Report, entitled "Protecting Consumer Privacy in an Era of Rapid Change," the FTC noted:

> The growth in mobile and social networking services in particular is striking, and is funded, in part, by the growth of targeted advertising that relies on use of consumer data.   At the same time, the enhanced ability to collect and store consumer data has increased the risks that data will be shared more broadly than understood or intended by consumers or used for purposes not contemplated or disclosed at the time of collection.

1   Protecting Consumer Privacy in an Era of Rapid Change, Preliminary FTC Staff Report, Dec. 2,

2   2010, p. 21-22, available at http://www.ftc.gov/os/2010/12/101201privacyreport.pdf.

3         69.     In its report, the FTC went on to describe the value of personal data to advertisers,

4   specifically singling out the value of Facebook IDs:

> Indeed, in the context of behavioral advertising, as noted above, the more
> information that is known about a consumer, the more a company will pay to
> deliver a precisely-targeted advertisement to him.  Not surprisingly, in recent years,
> there has been a dramatic increase in the number of companies whose business
> depends on the collection of increasingly detailed information about consumers.
> *See e.g.*, Emily Steel, A Web Pioneer Profiles Users by Name, Wall St. J., Oct.
> 25, 2010, available at http://online.wsj.com/article/SB10001424052702304410504575560243259416072.html (discussing company's sale of consumer profiles that
> have included information such as Facebook ID number, household income range,
> age, political leaning, gender, age of children in household as well as interests in
> religion, adult entertainment, "get rich quick" offers, and other topics).

11  *Id.* at 37 and n.103 (note incorporated into quotation above).

12        70.    The FTC also emphasized how technological developments have eroded the

13  distinction between personally identifiable information – such as that which Zynga collects from

14  its gaming apps users and transmits to third parties, as described above – and non-personally

15  identifiable information, explaining:

> Finally, roundtable discussions addressed the diminishing distinction between
> personally identifiable information ("PII") – e.g., name, address, Social Security
> number – and supposedly anonymous or de-identified information ("non-PII").
> Panelists representing industry, as well as academics and privacy advocates,
> acknowledged that the traditional distinction between the two categories of data has
> eroded and that information practices and restrictions that rely on this distinction
> are losing their relevance.

> Several factors have contributed to the breakdown of this dichotomy. Panelists
> cited the comprehensive scope of data collection and noted how businesses
> combine disparate bits of "anonymous" consumer data from numerous different
> online and offline sources into profiles that can be linked to a specific person.
> Technological developments also have helped to blur the line between PII and non-
> PII.  For example, using browser "fingerprinting" technology websites can gather
> and combine information about a consumer's web browser configuration –
> including the type of operating system used and installed browser plug-ins and
> fonts – to uniquely identify and track the consumer.

*Id.* at 35-36 (footnotes omitted).

**H.** **Zynga's "New" Privacy Policy And Its Implicit Admission Of Wrongdoing**

71. On November 30, 2010, after the lawsuits comprising this consolidated action had been filed, Zynga replaced its Old Privacy Policy with a materially revised, substantially longer new privacy policy (Zynga's "New Privacy Policy"). *See* Zynga Privacy Policy, *available at* http://www.zynga.com/privacy/privacy-policy.php (Last updated Nov. 30, 2010, last visited July 14, 2011).

72. Significantly, Zynga's New Privacy Policy no longer states that Zynga does "not sell or rent your 'Personally Identifiable Information' to any third party" or "does not provide any Personally Identifiable Information to third-party advertising companies," as did Zynga's Old Privacy Policy.

73. By revising its privacy policy in this manner, Zynga admits that its above-described practices of disclosing and transmitting its gaming apps users' personally identifiable information to third parties violated its Old Privacy Policy.

74. Significantly, although Zynga changed its privacy policy – in an effort to insulate itself from its wrongful conduct – there is no indication that Zynga has changed the way its gaming apps operate, nor has Zynga confirmed that it has ceased disclosing, transmitting and selling its gaming apps users' personally identifiable information to third parties.

75. By systematically collecting, transmitting, and divulging its gaming apps users' personally identifiable information to an unknown number of third parties, including advertisers, internet marketing companies, data brokers, and web tracking companies, Zynga has violated – and, on information and belief, continues to violate – the rights of Plaintiffs and the other Class and Subclass members under state and federal law.

## CLASS ACTION ALLEGATIONS

76. Plaintiffs bring this action on behalf of themselves and as a class action, pursuant to the provisions of Rules 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure on behalf of a class defined as:

> All registered users of Facebook who used any of Zynga's Facebook gaming applications from January 1, 2007, through the date of trial of this action.

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT – Case No. CV-10-04680-JW

- 15 -

(the "Class").   Excluded from the Class are Defendant and its subsidiaries and affiliates; all persons who make a timely election to be excluded from the Class; governmental entities; and the judges to whom this case is assigned and any immediate family members thereof.

77.     Plaintiff Adams also seeks to represent a subclass that includes each member of the proposed class who at any time during the relevant period purchased Zynga's "virtual currency" or "virtual goods" in any Zynga app offered through Facebook.com (the "Subclass").

78.     Certification of Plaintiffs' claims for class-wide treatment is appropriate because Plaintiffs can prove the elements of their claims on a class-wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claims.

79.     **Numerosity – Federal Rule of Civil Procedure 23(a)(1).**   The members of the Class and Subclass are so numerous that individual joinder of all Class and Subclass members is impracticable.   There are millions of individual registered Facebook users who have used Zynga's Facebook gaming apps and who are dispersed throughout the United States.   The precise number of Class and Subclass members and their addresses are unknown to Plaintiffs, but may be ascertained from Zynga's books and records.

80.     **Commonality and Predominance – Federal Rule of Civil Procedure 23(a)(2) and 23(b)(3).**   This action involves common questions of law or fact, which predominate over any questions affecting individual Class and Subclass members.   Such common questions of law or fact include:

a.     whether Zynga engaged in the conduct as alleged herein;

b.     whether Zynga's practices violate Zynga's privacy policies;

c.     whether Plaintiffs and the other members of the Class and Subclass are intended third-party beneficiaries of Facebook's policies that prohibit application developers like Zynga from transmitting and divulging their personally identifiable information to third parties;

d.     whether Zynga violated Facebook's policies;

e.     whether Zynga's practices violate applicable law;

f.    whether Plaintiffs and the other members of the Class and Subclass are entitled to actual, statutory, or other forms of damages, and other monetary relief; and

g.    whether Plaintiffs and the other members of the Class and Subclass are entitled to equitable relief, including but not limited to injunctive relief and restitution.

81.    Zynga engaged in a common course of conduct giving rise to the legal rights sought to be enforced by Plaintiffs, on behalf of themselves and the other Class and Subclass members. Similar or identical statutory and common law violations, business practices, and injuries are involved. Individual questions, if any, pale by comparison, in both quality and quantity, to the numerous common questions that dominate this action.

82.    **Typicality – Federal Rule of Civil Procedure 23(a)(3).** Plaintiffs' claims are typical of the claims of the other Class and Subclass members because, among other things, all Class and Subclass members were comparably injured through Zynga's uniform misconduct described above and were subject to Zynga's unwarranted and unauthorized violations of their personal privacy. Further, there are no defenses available to Zynga that are unique to Plaintiffs.

83.    **Adequacy of Representation – Federal Rule of Civil Procedure 23(a)(4).** Plaintiffs are adequate Class representatives because their interests do not conflict with the interests of the other Class members they seek to represent; they have retained counsel competent and experienced in complex class action litigation; and Plaintiffs will prosecute this action vigorously. The Class and Subclass's interests will be fairly and adequately protected by Plaintiffs and their counsel.

84.    **Declaratory and Injunctive Relief – Federal Rule of Civil Procedure 23(b)(2).** Zynga has acted or refused to act on grounds generally applicable to Plaintiffs and the other Class and Subclass members, thereby making appropriate final injunctive relief and declaratory relief, as described below, with respect to the members of the Class and Subclass as a whole.

85.    **Superiority – Federal Rule of Civil Procedure 23(b)(3).** A class action is superior to any other available means for the fair and efficient adjudication of this controversy,

1  and no unusual difficulties are likely to be encountered in the management of this class action.
2  The damages or other financial detriment suffered by Plaintiffs and the other Class and Subclass
3  members are relatively small compared to the burden and expense that would be required to
4  individually litigate their claims against Zynga, so it would be impracticable for Class and
5  Subclass members to individually seek redress for Zynga's wrongful conduct.  Even if the Class
6  and Subclass members could afford individual litigation, the court system could not.
7  Individualized litigation creates a potential for inconsistent or contradictory judgments, and
8  increases the delay and expense to all parties and the court system.  By contrast, the class action
9  device presents far fewer management difficulties and provides the benefits of single adjudication,
10  economy of scale, and comprehensive supervision by a single court.  Given the similar nature of
11  the Class and Subclass members' claims and the absence of material differences in the statutes and
12  common laws upon which the Class and Subclass members' claims are based, a nationwide class
13  will be easily managed by the Court and the parties.

## CLAIMS FOR RELIEF

### COUNT I

**VIOLATION OF THE ELECTRONIC COMMUNICATIONS PRIVACY ACT –
WIRETAP ACT**

*On Behalf of Plaintiffs, the Class, and the Subclass*

86.    Plaintiffs incorporate each of the foregoing allegations as if fully set forth herein.

87.    The Electronic Communications Privacy Act, 18 U.S.C. § 2510, *et seq.* (the "ECPA") broadly defines an "electronic communication" as "any transfer of signs, signals, writing, images, sounds, data, or intelligence of any nature transmitted in whole or in party by a wire, radio, electromagnetic, photoelectronic or photooptical system that affects interstate or foreign commerce …" 18 U.S.C. § 2510(12).

88.    Pursuant to the ECPA, Zynga operates an "electronic communications service" as defined in 18 U.S.C. § 2510(15).  Zynga provides its gaming apps users with the ability to send or receive electronic communications to or from Facebook, many of Zynga's millions of gaming apps users, and third parties who are not Zynga gaming apps users, including advertisers.

89.     In fact, a component of all of Zynga's Facebook gaming apps is the Zynga Message Center ("ZMC"), which allows Zynga app users to communicate with other Zynga users within Zynga's gaming apps.  In other words, Zynga expressly provides an electronic communications service.

90.     Zynga also provides its advertisers the ability to send electronic communications to Zynga gaming apps users by placing targeted advertisements on Zynga's gaming apps, and allows Zynga gaming apps users to receive those electronic communications and send electronic communications to advertisers by clicking on advertising banners within or through Zynga's gaming apps.

91.     The ECPA broadly defines the contents of a communication.  Pursuant to the ECPA, "contents" of a communication, when used with respect to any wire, oral, or electronic communications, include any information concerning the substance, purport, or meaning of that communication.  18 U.S.C. § 2510(8).

92.     "Contents," when used with respect to any wire or oral communication, includes any information concerning the identity of the parties to such communication or the existence, substance, purport, or meaning of that communication.  The definition thus includes all aspects of the communication itself.  No aspect, including the identity of the parties, the substance of the communication between them, or the fact of the communication itself, is excluded.  The privacy of the communication to be protected is intended to be comprehensive.

93.     The ECPA prohibits an electronic communications service provider from intentionally divulging the contents of any communication while in transmission on that service to any person or entity other than an addressee or intended recipient of such communication.  18 U.S.C. § 2511(3)(a).

94.     Plaintiffs and the other Class members are "person[s] whose … electronic communication[s] [are] disclosed … or intentionally used in violation of this chapter" within the meaning of 18 U.S.C. § 2520(a).

95.     When Plaintiffs and the other Class or Subclass members used Zynga's gaming apps, they created an electronic communication by clicking on a link within Facebook which

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT – Case No. CV-10-04680-JW

- 19 -

generated, through the transfer of electronic data over the Internet between at least the user and Facebook, a URL, that, without the user's knowledge, contained within it the user's personally identifiable information.

96.     Pursuant to Zynga's Privacy Policy and Facebook's Privacy Policy, Zynga's gaming apps users do not expect and do not consent to Zynga's disclosure of their personally identifiable information and hence do not expect or consent to the divulgence of the contents of these electronic communications, including the gaming apps user's identities and the identities of their Facebook friends, to third-parties, including advertisers, Internet marketing companies, data brokers, and web tracking companies.

97.     Zynga's design of its gaming apps and Zynga's agreements to provide user data to third parties are evidence of Zynga's business plan and general intent to sell the identities, communications, and personally identifiable information of its gaming apps users to third parties, including advertisers, Internet marketing companies, data brokers, and web tracking companies.

98.     By divulging its gaming apps users' identities and other user information to third parties without those gaming apps users' consent, Zynga intentionally violated 18 U.S.C. § 2511(3)(a).

99.     Zynga intentionally disclosed its gaming apps users' identities to third parties to enhance its profitability through advertising revenues.  Zynga's disclosure of its gaming apps users' personally identifiable information to those third parties was not necessary for the operation of Zynga's system, nor was it necessary to protect Zynga's rights or property.

100.    Each instance in which Zynga divulged its gaming apps users' personally identifiable information caused injury to those gaming apps users, and constitutes a separate and distinct violation of the ECPA.  Plaintiffs, on behalf of themselves and the other Class members, therefore seek redress as provided for by 18 U.S.C. § 2520, including such preliminary and other equitable or declaratory relief as may be appropriate, damages consistent with subsection (c) of that section to be proven at trial, punitive damages to be proven at trial, and attorneys' fees and other litigation costs reasonably incurred.

101.   Plaintiffs and the other Class members, pursuant to 18 U.S.C. § 2520(2), are entitled to preliminary, equitable, and declaratory relief, in addition to statutory damages of the greater of $10,000 or $100 a day for each day of violation, actual and punitive damages, reasonable attorneys' fees, and Zynga's profits obtained from the violations described herein.

### COUNT II

**VIOLATIONS OF THE ELECTRONIC COMMUNICATIONS PRIVACY ACT-
STORED COMMUNICATIONS ACT**

*On behalf of Plaintiffs, the Class, and the Subclass*

102.   Plaintiffs incorporate each of the foregoing allegations as if fully set forth herein.

103.   The Stored Communications Act of 1986 ("SCA") incorporates the ECPA's definition of an "electronic communication service." 18 U.S.C. § 2711(1). As set forth above, Zynga is an electronic communications service provider within the meaning of the ECPA and is therefore also subject to the restrictions contained in the SCA governing electronic communications service providers.

104.   In the alternative, Zynga provides a remote computing service to the public in that computer processing of a Zynga gaming app and/or advertising delivery platform occurs on a remote server and is accomplished by means of an electronic communications system.

105.   The SCA also incorporates the ECPA's broad definition of "electronic communication" and "electronic storage." 18 U.S.C. § 2711(1). Pursuant to the ECPA and SCA, "electronic storage" means any "temporary storage of a wire or electronic communication incidental to the electronic transmission thereof." 18 U.S.C. § 2510(17)(A).   This type of electronic storage includes communications in intermediate electronic storage that have not yet been delivered to their intended recipient.

106.   Zynga provides an electronic communication service to the public, within the meaning of 18 U.S.C. § 2510(15).

107.   Plaintiffs' and the other Class and Subclass members' unique Facebook IDs are electronic communications within the meaning of 18 U.S.C. § 2510(12), as are ZMC messages, private messages, and posts related to user's activities within Zynga's gaming apps not yet

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT – Case No. CV-10-04680-JW

1  received by their intended recipient(s).

2      108.   Zynga holds Plaintiffs' and the other Class and Subclass members' electronic

3  communications in electronic storage, within the meaning of 18 U.S.C. § 2510(17).

4      109.   In the alternative, when Plaintiffs and other Class and Subclass members use a

5  Zynga gaming app, they transmit electronic communications through the internet to at least

6  Facebook to enable those users to play and interact with a Zynga gaming app.  These electronic

7  communications are remotely processed on a distant server and held in at least temporary storage

8  during the course of their transmission and processing.

9      110.   The SCA prohibits any electronic communications service provider or remote

10 computing service provider from divulging to any person or entity the contents of a

11 communication while in electronic storage by that service.  18 U.S.C. § 2702(a)(1).

12     111.   Zynga knowingly and/or intentionally divulges the contents of Plaintiffs' and the

13 other Class and Subclass members' electronic communications while in electronic storage to third

14 parties, including advertisers, Internet marketing companies, data brokers, and web tracking

15 companies.

16     112.   Plaintiffs and the other Class and Subclass members are "person[s] aggrieved by

17 [a] violation of [the SCA] in which the conduct constituting the violation is engaged in with a

18 knowing or intentional state or mind …" within the meaning of 18 U.S.C. § 2707(a).

19     113.   Each instance of Zynga's wrongful conduct, as set forth above, constitutes a

20 separate and distinct violation of the Electronic Communications Privacy Act, 18 U.S.C. §§ 2702,

21 *et seq.*, in that Zynga, by its alleged conduct, intentionally and/or knowingly divulged the contents

22 of Plaintiffs' and the other Class members' electronic communications to third parties,  while such

23 communications were in electronic storage.

24     114.   Zynga divulged the contents of Plaintiffs' and the other Class and Subclass

25 members' electronic communications without proper authorization, without lawful consent of the

26 originator and/or the addressees of such communications, and, in the alternative, without the

27 lawful consent of the subscriber to Zynga's remote computing service, and without need incident

28 to the rendition of Zynga's services or to protect Zynga's rights or property.

115.    Pursuant to 18 U.S.C. §2707, Plaintiffs and the other Class and Subclass members are entitled to such preliminary or other equitable or declaratory relief as may be appropriate, including statutory damages, actual and punitive damages, costs and reasonable attorneys' fees, plus disgorgement of any profits defendant earned as a result of such violations of law.

**COUNT III**

**VIOLATION OF THE COMPUTER FRAUD AND ABUSE ACT**

*On behalf of Plaintiffs, the Class, and the Subclass*

(This Count has been dismissed with prejudice as to the Class, and is included only to preserve a potential appeal as to the Class.  This Count has not been ruled upon as to the Subclass.)

116.    Plaintiffs incorporate each of the foregoing allegations as if fully set forth herein.

117.    By its conduct, as alleged above, Zynga intentionally accessed Plaintiffs' and the other Class and Subclass members' computers without authorization and/or in excess of any authorized access, and, in so doing, intentionally breached its own published privacy policy, as well as Facebook's Platform Policies

118.    Zynga illegally obtained the above-referenced information from Plaintiffs and the other Class and Subclass members' protected computers, involved in interstate or foreign communication.

119.    By accessing without authorization and/or exceeding any authorized access to Plaintiffs' and the other Class and Subclass members' protected computers, Zynga obtained information from those computers it was not authorized to obtain.

120.    By engaging in the wrongful conduct described herein, Zynga caused Plaintiffs and the other Class members to suffer damage or loss by misappropriating and disclosing to others Plaintiffs' and the other Class and Subclass members' personally identifiable information and/or by providing an inferior product or service.

121.    Zynga caused damage or loss during a one-year period aggregating in excess of $5,000 because, among other things, Subclass members purchased in excess of $5,000 of virtual goods and/or currency from Zynga.

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT – Case No. CV-10-04680-JW

122.   Pursuant to 18 U.S.C. § 1030(g), Plaintiffs and each of the other Class and Subclass members are entitled to preliminary, equitable, and declaratory relief, as may be appropriate, compensatory damages, reasonable attorneys' fees and costs, and any other relief the Court deems appropriate as a result of such violations of law.

## COUNT IV

### VIOLATION OF CAL. BUS. & PROF. CODE § 17200

*On Behalf of Plaintiffs, the Class, and the Subclass*

(This Count has been dismissed with prejudice as to the Class, and is included only to preserve a potential appeal as to the Class. This Count has not been ruled upon as to the Subclass.)

123.   Plaintiffs incorporate each of the foregoing allegations as if fully set forth herein.

124.   California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code § 17200, *et seq.*, protects both consumers and competitors by promoting fair competition in commercial markets for goods and services.

125.   The UCL prohibits any unlawful, unfair, or fraudulent business act or practice.  A business practice need only meet one of the three criteria to be considered unfair competition.  An unlawful business practice is anything that can properly be called a business practice and that at the same time is forbidden by law.

126.   Zynga's nonconsensual disclosure, transmission, and sale of its gaming apps users' personally identifiable information to third parties without their authorization constitute violations of the UCL.

127.   Zynga has violated the "unlawful" prong of the UCL in that Zynga's conduct violated, among other things, the ECPA (18 U.S.C. § 2510, *et seq.*), the SCA (18 U.S.C. § 2701, *et seq.*), the Computer Fraud and Abuse Act (18 U.S.C. § 1030, *et seq.*), and Consumer Legal Remedies Act (Cal. Civ. Code § 1750, *et seq.*).

128.   In addition, under Civil Code Sections 1798.83-1798.84, consumers must be permitted to learn how their personal information is shared by companies for marketing. Businesses such as Zynga must provide either:  (a) a list of the categories of personal information disclosed to other companies for their marketing purposes during the preceding calendar year, with

1  the names and addresses of those companies, or (b) a privacy statement giving the customer a

2  cost-free opportunity to opt-out of such information sharing.

3       129.  Zynga has failed to advise Plaintiffs and the other Class and Subclass members

4  how much and what types of personal information Zynga has gathered and shared, has failed to

5  provide them a list of the categories of personal information acquired and disclosed, and has failed

6  to provide a clear, conspicuous, and unambiguous privacy statement that details what information

7  Zynga collects and how to opt out of that practice.

8       130.  Zynga violated the "fraudulent" prong of the UCL by explicitly representing in its

9  Old Privacy Policy that it does "not sell or rent [its app users'] 'Personally Identifiable

10  Information' to any third party" and "does not provide any [of its app users'] Personally

11  Identifiable Information to third-party advertising companies."

12       131.  Zynga used those misrepresentations to induce its gaming apps users to submit

13  their personally identifiable information to Zynga, which Zynga then knowingly transmitted to

14  third parties without those gaming apps users' authorization.

15       132.  Zynga violated the "unfair" prong of the UCL by gaining control over and

16  disclosing, transmitting, and selling its gaming apps users' personally identifiable information to

17  third parties without their consent and under false pretenses.

18       133.  Zynga's unfair or deceptive practices occurred primarily and substantially in

19  California, where Zynga is headquartered.  Zynga's decisions concerning its disclosure and

20  transmission of its gaming apps users' personally identifiable information to third parties were

21  made in California.  Moreover, Zynga maintains all or a substantial part of its computer systems

22  containing user information in California, and its disclosure and transmission of its gaming apps

23  users' personally identifiable information took place primarily and substantially in California.

24       134.  Pursuant to California Business & Professions Code section 17203, Plaintiffs, on

25  behalf of themselves and the other Class and Subclass members, request an Order of this Court

26  requiring Zynga to immediately cease such acts of unfair competition and enjoining Zynga from

27  continuing to conduct business by and through its unlawful, fraudulent, or unfair business acts and

28  practices set forth in this Complaint.

135.   Additionally, Plaintiffs, on behalf of themselves and the other Class and Subclass members, request an Order from the Court requiring that Zynga provide equitable relief so as to prevent Zynga from benefitting from practices that constitute acts of unfair competition or the use or employment of any monies resulting from such practices, including to the fullest extent permitted by law, requiring the payment of monies (including monies paid to Zynga by third parties, including advertisers, internet marketing companies, data brokers, and web tracking companies, that received Plaintiffs' and the other Class and Subclass members' personally identifiable information) (also including money paid to Zynga by members of the Subclass in exchange for virtual currency for use in Zynga apps) as may be necessary to ensure such funds are properly disgorged from Zynga and paid over in restitution to the Class and the Subclass. Plaintiffs, on behalf of themselves and the other Class and Subclass members, also request that the Court impose a constructive trust over such monies, to the fullest extent permitted by law. Plaintiffs, on behalf of themselves and the other Class and Subclass members, also request an award of attorneys' fees and costs pursuant to Cal. Code of Civil Procedure section 1021.5 and the private Attorney General, substantial benefit, and common fund doctrines.

**COUNT V**

**VIOLATION OF THE CONSUMERS LEGAL REMEDIES ACT, CAL. CIV. CODE § 1750, *ET SEQ.***

*On Behalf of Plaintiffs, the Class, and the Subclass*

(This Count has been dismissed with prejudice as to the Class, and is included only to preserve a potential appeal as to the Class.  This Count has not been ruled upon as to the Subclass.)

136.   Plaintiffs incorporate each of the foregoing allegations as if fully set forth herein.

137.   The Consumers Legal Remedies Act prohibits the act, use or employment by any person of any deception, fraud, false pretense, false promise, misrepresentation, concealment, suppression or omission of any material fact with intent that others rely upon such act in connection with the sale or advertisement of any merchandise whether or not any person has in fact been misled, deceived or damaged thereby.

138.    As alleged above, Zynga has engaged in deceptive practices, unlawful methods of competition, and/or unfair acts as defined by Cal. Civ. Code §§ 1750, *et seq.*, to the detriment of Plaintiffs and the other Class and Subclass members.

139.    Zynga, acting with knowledge, intentionally and unlawfully brought harm upon Plaintiffs and the other Class and Subclass members by deceptively inducing them to enable Zynga to collect their personally identifiable information and use Zynga's Facebook gaming apps, based upon Zynga's deceptive and misleading representations that Zynga would not disclose its gaming apps users' personally identifiable information to third parties.    Specifically, Zynga violated Cal. Civ. Code § 1750 in, at least, the following respects:

a.    Zynga violated § 1770(a)(5) by representing that its goods or services have characteristics and benefits that they do not have;

b.    Zynga violated § 1770(a)(14) by representing that a transaction confers or involves rights, remedies, or obligations which it does not have or involve, or which are prohibited by law; and

c.    Zynga    violated § 1770(a)(16) by    representing    that    the    subject    of    a transaction has been supplied in accordance with a previous representation when it has not.

140.    Plaintiffs and the other Class and Subclass members have suffered harm as a direct and proximate result of Zynga's violations of law and wrongful conduct.

141.    Under Cal. Civ. Code § 1780(a) & (b), Plaintiffs, on behalf of themselves and the other Class and Subclass members, seek injunctive relief requiring Zynga to cease and desist from its illegal conduct described herein, and for any other appropriate remedy for Zynga's CLRA violations.    For the sake of clarity, Plaintiffs disclaim any claim for damages under the CLRA at this time.

## COUNT VI

### BREACH OF CONTRACT

*On Behalf of Plaintiffs, the Class, and the Subclass*

142.    Plaintiffs incorporate each of the foregoing allegations as if fully set forth herein.

143.    The products and services Zynga offered to Plaintiffs and the other Class and

1    Subclass members, including its Facebook gaming apps, are governed by a written privacy policy

2    contract. *See, e.g.*, Exhibit A.

3        144.    In order to register for and use its gaming apps, Zynga requires that Plaintiffs and

4    the Class affirmatively assent and agree to be bound by Zynga's Privacy Policy (the

5    "Agreement").

6        145.    The Agreement's provisions constitute a valid and enforceable contract between

7    Plaintiffs and the Class on the one hand, and Zynga on the other.

8        146.    In its Agreement, Zynga represents that it does "not sell or rent your 'Personally

9    Identifiable Information' to any third party" and "does not provide any Personally Identifiable

10   Information to third-party advertising companies."

11       147.    The Agreement is Zynga's offer to potential users of its products, by which Zynga

12   promises to treat those users' information in specified ways.  Plaintiffs and the other Class and

13   Subclass members have accepted Zynga's offer by using Zynga's gaming apps.

14       148.    The promises contained in Zynga's Agreement and Plaintiffs' and other Class and

15   Subclass members' use of Zynga's gaming apps are each sufficient consideration to support a

16   contractual obligation.

17       149.    Under the Agreement, Plaintiffs and the other Class and Subclass members

18   transmitted personally identifiable information to Zynga in exchange for use of Zynga's gaming

19   apps and Zynga's promise that it would not divulge that personally identifiable information to

20   third parties, including but not limited to advertisers.

21       150.    By reason of the conduct described above, Zynga has uniformly breached its

22   contract with Plaintiffs and each of the other Class and Subclass members by divulging,

23   transmitting, renting, selling, and/or otherwise providing their personally identifiable information

24   to third parties in breach of the terms of its Agreement, and by such other actions now unknown

25   but to be proven at trial.

26       151.    As a result of Zynga's misconduct and breach of the Agreement described herein,

27   Plaintiffs and the other Class and Subclass members sustained damages. Plaintiff and the other

28   Class and Subclass members did not receive the benefit of the bargain for which they contracted

1    and for which they paid valuable consideration in the form of their personally identifiable

2    information, which, as alleged above, has ascertainable value to be proven at trial (and in the form

3    of U.S. currency for Subclass members).   In other words, Plaintiff and the other Class and

4    Subclass members relinquished something of demonstrable value – their PII – in exchange for

5    access to Zynga's gaming apps and Zynga's privacy promises.   Zynga materially breached its

6    Agreement with its customers by violating its privacy terms, thus depriving Plaintiffs and the other

7    Class and Subclass members the benefit of the bargain.   Thus, their actual and appreciable

8    damages take the form of the value of their PII that Zynga wrongfully shared with its advertisers

9    and other third parties – in direct breach of the Agreement.   The actual and appreciable damages

10   for Subclass members take the form of the monies they paid for Zynga virtual currency.

11          152.    Thus, as a direct and proximate result of the aforementioned wrongful conduct and

12   breach committed by Zynga, Plaintiffs and the other Class members have suffered and will

13   continue to suffer damages and losses in an amount to be proven at trial.

14                                          **COUNT VII**

15              **BREACH OF THE DUTY OF GOOD FAITH AND FAIR DEALING**

16                  *On Behalf of Plaintiffs, the Class, and the Subclass*

17          153.    Plaintiffs incorporate each of the foregoing allegations as if fully set forth herein.

18          154.    Zynga's Agreement with Plaintiffs and the other Class and Subclass members

19   included the term, implied at law in all contracts, requiring the parties to exercise "good faith and

20   fair dealing" in all duties relating to the performance of the contract.

21          155.    By engaging in the misconduct alleged herein, Zynga has breached its contractual

22   duty of good faith and fair dealing with Plaintiffs and the other Class and Subclass members.

23          156.    The elements of a claim for breach of the covenant of good faith and fair dealing

24   are: (a) an agreement between the parties; (b) plaintiff's performance; (c) defendant engaged in

25   conduct separate and apart from the performance of obligations under the agreement without good

26   faith and for the purpose of depriving plaintiff of rights and benefits under the agreement; and (d)

27   damages to plaintiff.  All of the necessary elements are pleaded in this Complaint.

28

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT – Case No. CV-10-04680-JW

157.    An agreement between Plaintiffs and the other members of the Class and Subclass, on the one hand, and Zynga, on the other, existed.  Plaintiffs and the other members of the Class and Subclass accepted and agreed to Zynga's Agreement when they used a Zynga Facebook gaming app.

158.    Plaintiffs and the other members of the Class and Subclass fully performed their duties under the Agreement.

159.    Indeed, if any Class or Subclass member fails to perform any of his or her duties under the Agreement, then Zynga would not permit the person to open, or keep open, an account, and would prevent those Class or Subclass members from playing Zynga's games.

160.    Zynga engaged in conduct separate and apart from the performance of its obligations under the Agreement without good faith and for the purpose of depriving Plaintiffs and the other Class and Subclass members of rights and benefits under the Privacy Policy.

161.    Instead of fairly dealing with its customers who sought to access and play Zynga's various online games under the protections and limitations of Zynga's Privacy Policy, Zynga violated its promises and divulged its users' personally identifiable information to third parties without their authorization or consent.

162.    Zynga's actions are without good faith and are for the sole purpose of depriving Plaintiffs and the other Class and Subclass members of rights and benefits under the Agreement. Plaintiffs accepted Zynga's promise to abide by the terms of its Agreement.

163.    That Zynga intentionally breached the terms of its Agreement and divulged its customers' personally identifiable information to third parties – despite specifically promising not to do so and doing it without its customers' authorization or consent – epitomizes Zynga's bad faith and its unfair dealing with Plaintiffs and the other members of the Class.

164.    Likewise, that Zynga collects substantial amounts of money from Subclass members who purchased "virtual currency" from Zynga with U.S. currency, usable only within a Zynga game that they would not have purchased but-for Zynga's promise to abide by its Agreement, is a further demonstration of Zynga's bad faith and unfair dealing.

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT – Case No. CV-10-04680-JW

165.    Plaintiffs and the other members of the Class and Subclass have sustained damages in an amount to be established at trial.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and the other members of the Class and Subclass described in this Complaint, respectfully request that:

A.     the Court certify the Class and Subclass pursuant to Fed. R. Civ. P. 23(b)(2) and 23(b)(3), and adjudge Plaintiffs and their counsel to be adequate representatives thereof;

B.     the Court enter an Order requiring Zynga to pay Plaintiffs' and the other Class and Subclass members' economic, monetary, actual damages (including multiple damages), consequential, compensatory or statutory damages, whichever is greater; and, if its conduct is proved willful, awarding Plaintiffs and the other Class and Subclass members exemplary damages;

C.     the Court enter an Order awarding restitution and disgorgement of Zynga's revenues arising from its conduct alleged above, or any other appropriate remedy in equity, to Plaintiffs and the other Class and Subclass members;

D.     the Court enter an Order awarding declaratory and injunctive relief as permitted by law or equity, including: enjoining Zynga from continuing the unlawful practices set forth above; directing Zynga to modify its Facebook gaming applications so that Zynga no longer divulges its gaming app users' personally identifiable information to third parties, and to disgorge all monies Zynga acquired by means of any act or practice declared by this Court to be wrongful;

E.     the Court enter an Order awarding Plaintiffs and the other Class and Subclass members their expenses and costs of suit, including reasonable attorneys' fees and reimbursement of reasonable expenses, to the extent provided by law;

F.     the Court enter an Order awarding to Plaintiffs and the other Class and Subclass members pre- and post-judgment interest, to the extent allowable; and

G.     for such other and further relief as may be just and proper.

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT – Case No. CV-10-04680-JW

**JURY DEMAND**

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury of all claims in this Complaint so triable.

Dated:  July 15, 2011

WOLF HALDENSTEIN ADLER
  FREEMAN & HERZ LLC
ADAM J. LEVITT (*pro hac vice*)
EDMUND S. ARONOWITZ (*pro hac vice*)


_____/s/ Adam J. Levitt_____
ADAM J. LEVITT (*pro hac vice*)

55 West Monroe Street, Suite 1111
Chicago, Illinois  60603
Telephone:  312/984-0000
Facsimile:  312/984-0001
levitt@whafh.com
aronowitz@whafh.com

WOLF HALDENSTEIN ADLER
  FREEMAN & HERZ LLP
FRANCIS M. GREGOREK
BETSY C. MANIFOLD
RACHELE R. RICKERT
PATRICK H. MORAN
750 B Street, Suite 2770
San Diego, California  92101
Telephone:  619/239-4599
Facsimile:  619/234-4599
gregorek@whafh.com
manifold@whafh.com
rickert@whafh.com
moran@whafh.com

SEEGER WEISS LLP
JONATHAN SHUB
10960 Wilshire Boulevard
Los Angeles, California  90024
Telephone:  310/477-2244
Facsimile:  310/477-4123
jshub@seegerweiss.com

EDELSON MCGUIRE, LLC
MICHAEL ASCHENBRENER (SBN 277114)
350 North LaSalle Street, 13th Floor
Chicago, Illinois  60654
Telephone: 312/589-6370
Facsimile: 312/589-6378
maschenbrener@edelson.com

*Plaintiffs' Interim Co-Lead Counsel*

ZYNGA:22818v1

DECLARATION OF SERVICE

I, Maureen Longdo, the undersigned, declare:

1.     That declarant is and was, at all times herein mentioned, a citizen of the United States and a resident of the County of San Diego, over the age of 18 years, and not a party to or interested in the within action; that declarant's business address is 750 B Street, Suite 2770, San Diego, California 92101.

2.     That on July 15, 2011, declarant served the SECOND AMENDED CONSOLIDATED AMENDED CLASS ACTION COMPLAINT via the CM/ECF System to the parties who are registered participants of the CM/ECF System.

3.     That there is regular communication between the parties.

I declare under penalty of perjury that the foregoing is true and correct.  Executed this 15th day of July 2011, at San Diego, California.



MAUREEN LONGDO

ZYNGA GAME NETWORK, INC.
Service List – October 28, 2010
Page 1

COUNSEL FOR PLAINTIFFS

Francis M. Gregorek
Betsy C. Manifold
Rachele R. Rickert
Patrick H. Moran
WOLF HALDENSTEIN ADLER
  FREEMAN & HERZ LLP
750 B Street, Suite 2770
San Diego, CA 92101
        619/239-4599
        619/234-4599 (fax)
gregorek@whafh.com
manifold@whafh.com
rickert@whafh.com
moran@whafh.com

Adam J. Levitt
Edmund S. Aronowitz
WOLF HALDENSTEIN ADLER
FREEMAN & HERZ LLP
55 West Monroe Street, Suite 1111
Chicago, IL 60603
        312/984-0000
        312/984-0001 (fax)
levitt@whafh.com
aronowitz@whafh.com

*   William J. Doyle II
    John A. Lowther
    DOYLE LOWTHER LLP
    9466 Black Mountain Road, Suite 210
    San Diego, CA 92126
            619/573-1700
            619/573-1701 (fax)
    bill@doylelowther.com
    john@doylelowther.com

*   Alan M. Mansfield
    THE CONSUMER LAW GROUP
    9466 Black Mountain Road, Suite 225
    San Diego, CA 92126
            619/308-5034
            888/341-5048 (fax)
    alan@clgca.com

**Attorneys for Plaintiffs Gudac and Beiles**

17868

*   Shawn Khorrami
    Robert J. Drexler, Jr.
    Launa Adolph
    KHORRAMI POLLARD & ABIR LLP
    444 S. Flower Street, 33rd Floor
    Los Angeles, CA 90071
            213/596-6000
            213/596-6010 (fax)
    skhorrami@kpalawyers.com
    rdrexler@kpalawyers.com
    ladolph@kpalawyers.com

*   Harris L. Pogust
    Bharati O. Sharma
    POGUST, BRASLOW & MILROOD, LLC
    Eight Tower Bridge, Suite 1520
    161 Washington Street
    Conshohocken, PA 19423
            610/941-4204
            610/941-4245 (fax)
    hpogust@pbmattorneys.com
    bsharma@pbmattorneys.com

**Attorneys for Plaintiff Albini**

Kassra P. Nassiri
Charles H. Jung
NASSIRI & JUNG LLP
47 Kearny Street, Suite 700
San Francisco, CA 94108
        415/762-3100
        415/534-3200 (fax)
knassiri@nassiri-jung.com
ejung@nassiri-jung.com

Michael J. Aschenbrener
EDELSON MCGUIRE LLC
350 North LaSalle Street, Suite 1300
Chicago, IL 60654
        312/589-6370
        312/589-6378 (fax)
maschenbrener@edelson.com

**Attorneys for Plaintiff Graf**

ZYNGA GAME NETWORK, INC.
Service List – October 28, 2010
Page 2

COUNSEL FOR PLAINTIFFS

Jonathan Shub
SEEGER WEISS LLP
10960 Wilshire Blvd.
Los Angeles, CA 90024
    310/477-2244
    310/477-4123 (fax)
jshub@seegerweiss.com

Christopher A. Seeger
David R. Buchanan
SEEGER WEISS LLP
One William Street
New York, NY 10004
    212/584-0700
    212/584-0799 (fax)
cseeger@seegerweiss.com
dbuchanan@seegerweiss.com

Michael J. Boni
BONI & ZACK, LLP
15 St. Asaphs Road
Bala Cynwyd, PA 19004
    610/822-0200
    610/822-0206 (fax)
mboni@bonizack.com

\* Eric D. Freed
FREED & WEISS LLC
111 West Washington Street, Suite 1331
Chicago, IL 60602
    312/220-0000
    312/220-7777 (fax)
eric@freedwiess.com

\* Marc H. Edelson
44 West Court Street
Doylestown, PA 18901
    215/230-8043
    215/230-8735 (fax)
medelson@edelson-law.com

**Attorneys for Plaintiff Schreiber**

Juli E. Farris
Mark A. Griffin
David J. Ko
KELLER ROHRBACK LLP
1201 Third Avenue, Suite 3200
Seattle, WA 98101
    206/623-1900
    206/623-3384 (fax)
jfarris@kekllerrohrback.com
mgriffin@kellerrohrback.com
dko@kellerrohrback.com

**Attorneys for Plaintiff Swanson**

Jeff S. Westerman
Sabrina S. Kim
MILBERG LLP
One California Plaza
300 South Grand Ave., Suite 3900
Los Angeles, CA 90071
    213-617-1200
    213-617-1975 (fax)
jwesterman@milberg.com
skim@milberg.com

\* Peter E. Seidman
MILBERG LLP
One Pennsylvania Plaza, 49th Floor
New York, NY 10119-0165
    212-594-5300
    212-868-1229 (fax)
pseidman@milberg.com

Michael Robert Reese
Kim E. Richman
REESE RICHMAN LLP
875 Avenue of the Americas, 18th Floor
New York, NY 10001
    212-579-4625
    212 253-4272 (fax)
michael@reeserichman.com

**Attorneys for Plaintiffs Phee and O'Hara**

17868

ZYNGA GAME NETWORK, INC.
Service List – October 28, 2010
Page 3

COUNSEL FOR PLAINTIFFS

Adam Gutride
Kristen Gelinas Simplicio
Seth Adam Safier
GUTRIDE SAFIER LLP
835 Douglass Street
San Francisco, CA 94114
     415/271-6469
     415/449-6469 (fax)
adam@gutridesafier.com
Kristen@gutridesafier.com
seth@gutridesafier.com

**Attorneys for Plaintiff Carmel-Jessup**

\* Eric H. Gibbs
Dylan Hughes
David Knothe Stein
GIRARD GIBBS LLP
601 California Street
Suite 1400
San Francisco, CA 94108
     415/981-4800
     415/981-4846 (fax)
ehg@girardgibbs.com
dsh@girardgibbs.com
ds@girardgibbs.com

\* Andrew N. Friedman
Daniel A. Small
Stefanie M. Ramirez
COHEN MILSTEIN SELLERS & TOLL
PLLC
1100 New York Avenue
Suite 500, West Tower
Washington, DC 98104
     202/408-4600
     202/408-4699 (fax)
afriedman@cohenmilstein.com
dsmall@cohenmilstein.com
sramirez@cohenmilstein.com

Philip Scott Friedman
Attorney at Law
2401 Pennsylvania Ave., N.W., Suite 410
Washington, DC 20037
     202/293-4175
     202/318-0395 (fax)
psf@consumerlawhelp.com

**Attorneys for Plaintiffs Bryant and Brock**

COUNSEL FOR DEFENDANTS

Richard L. Seabolt
Suzanne R. Fogarty
Oliver E. Benn
DUANE MORRIS LLP
Spear Tower
One Market Plaza, Suite 2200
San Francisco, CA 94105-1127
     415/957-3000
     415/957-3001 (fax)
RLSeabolt@DuaneMorris.com
SRFogarty@DuaneMorris.com
Obenn@DuaneMorris.com

Attorneys for Defendant
ZYNGA GAME NETWORK INC.

\* Denotes service via U.S. Mail